The Honorable, the Judges of the United States Court of Appeals for the 4th Circuit. Thank you. Please be seated. Mr. Connell? Is that how it's spelled? You are correct, Your Honor. Thank you. Great effort at the first stab. My name is Christian Connell, and I represent Benjamin Galecki, one of the two appellants in this matter. I will only address two of the issues that we have presented, and I will defer to Mr. Schnook and ask that you address your questions to Mr. Schnook on the other questions. Two questions I'm going to address are the first question, which dealt with the jury instruction and how that was erroneous, and I'm also going to address the exclusion of the testimony of Dr. Arthur Barrier, who is a chemist, one of the senior chemists with the DEA, who we intended to call and properly subpoenaed and properly issued a two-year request to testify about one of the relevant issues in the case. I'll begin with the erroneous jury instruction. This case involved a controlled substance analog, the key word being an analog. The test is a mouthful, but I'm going to go through it. The test is twofold. One, was the substance they were distributing substantially similar in its chemical structure to a Schedule I or II substance? And two, was it substantially similar in its pharmacological effects to a Schedule I or II substance? You know we've read your brief. Yes, sir. Yes, sir. So I'll jump ahead. The critical element is the mens rea. The Supreme Court adopted a mens rea that paralleled the mens rea for a controlled substance. So they said, just like a controlled substance, there are two ways you can establish mens rea. The first way being you can show that it's controlled, as in listed on the Schedules I or II, or treated like a Scheduled I or II substance by virtue of the Analog Act. That's prong one. That was in the jury instruction. Prong two, you can show that it has the features or characteristics that make it a controlled substance analog. In other words, you have to show that we knew it had those features. And those are the two I described to you. You have to show that Mr. Galecki and Mr. Ritchie knew that it was structurally similar in its chemical structure, substantially similar in its chemical structure. You know we've read your brief. Yes, sir. Okay. So here's the point. The instruction was clearly, it was absolutely erroneous. So then you turn to the next part of the analysis. The next part of the analysis, was it harmless beyond a reasonable doubt? Before I get there, I want to emphasize this point. How do we know that was the effect of the instruction? I think the government takes the position that it set out, and the instruction set out in the definitional section, everything that was encompassed within the Supreme Court's concept of these analog drugs. And even though the instruction that followed a couple paragraphs later didn't cover it word for word the same way the Supreme Court did, that when you put those two parts of the instruction together, that that was sufficient. Well, we disagree with that, Your Honor. Well, I can figure that. Why don't you tell us why? Well, if you read what the statement they wrote, I think it's on, I mean, it's to my way of thinking it's nonsensical. If you can explain this to me, how about it? Well, it's not up to me to explain it. Yes, sir. I understand that. It's up to us. Here's what they say on page 17 of their brief as required in knowledge. Remember, they have to show, it's their burden to show, we knew substantially similar in its chemical structure, substantially similar in its pharmacological effects. Here's what they show that the instruction accomplished, at the bottom of 17. Thus, in the context of the court's charge, knowing the specific analog should be understood to encompass these characteristics. Don't they have it exactly backwards? That's exactly backwards. You can't assume because you know that that's what is required to prove it's an analog that we knew those are the characteristics it had. But that's what they're asking you to do. That's backwards logic. They didn't have it in the instruction. It's pure and simple. How do you know that? We know that from their own argument. If you look at Mr. Hurt's closing argument in the joint appendix, here's what he said to the ladies and gentlemen of the jury. How do we know the judge effectively directed a verdict on mens rea? Here's what Mr. Hurt stood up and said. This is a joint appendix, page 1936. And the only issue in this case, ladies and gentlemen, really the only issue, it boils down to one thing. Are UR-144 and JWH-018 substantially similar? That is the only issue in this trial. Do you know what he did not argue the entire time in his closing statement? That we had knowledge. The only time you'll see in either his closing statement or his rebuttal closing statement that he even addresses that component is when he says, his statement is, there's an e-mail. And he refers to the e-mail once on one page. Did he say in his argument whether or not he knew it doesn't even matter to you, ladies and gentlemen of the jury? It just doesn't matter. Did he say that? No, sir. No, sir. But that's a much harder thing to prove, knowledge, than simply proving that we knew that it had the characteristics. I'm saying sometimes lawyers shorthand, no lawyer gets up and says everything he has to say in what the law is. The judge would stop him. Well, there's another component, Your Honor. Not only that, but based on that instruction, we didn't get to offer mens rea evidence. We wanted to call. That's a different question. But it's part of the question. No, it's not. No, it's not. It's a different question as to what the point you were just making. You might be right or not on both points. Yes, sir. But you talked about the jury argument then versus what you are allowed to offer as evidence. Two different questions. Now, you might could try to link them together and go that points out that knowledge wasn't at play. But what he said doesn't point that out necessarily is my point. Yes, Your Honor. I will also point out we've cited to you in our brief multiple court of appeals opinions since the McFadden Supreme Court opinion, including this court's opinion. None of them short-circuit the knowledge requirement like was done in the trial court in this case. None of them jump to the line that all they had to show was that we knew the, quote, unquote, analog we were dealing with, whatever that means. None of them were like that. Not Macker. In the cases we cite, this was not this error. You're making an argument that the jury instruction was inappropriate. It's a pretty tough hill to climb normally. You know that, don't you? Because you have to show taking it as a whole, it wasn't at least acceptably fair representation. I'm glad you put it that way, Your Honor, because if you notice when it comes to the mens rea instruction, I would ask the court there was only one mens rea instruction. And the court, in fact, began it with saying this is the mens rea instruction. This is the knowledge requirement. That instruction, the normal rule is exactly what you said. You've got to take all of the jury instructions to decide, interpret them. In this case, I would say it was this jury instruction was the predominant instruction, and it actually infected and made all the other instructions inadequate because that was the knowledge that they were required to prove or lack of knowledge they were required to prove. You know what? It seems to me if you have that point, just make it straightforwardly to us and tell us why. Without the history on it. Just tell us why was it wrong and why was it critically wrong. Just tell us that. It ignored what the Supreme Court said in McFadden. No, don't argue with me. Just say it. What the Supreme Court said in McFadden and what this court said to satisfy the knowledge requirement, they had to show that the defendants knew. They had to know that it was substantially similar in its chemical structure to a Schedule I or II substance, and they had to show that the defendants knew it was substantially similar in its physiological effects to a Schedule I or II substance. That was lacking. All they had to show is we knew it was XLR11 or knew it was UR144. But was there evidence that they knew the pharmacological effect was the same? I would say there was some evidence, yes. But there was no evidence about structural similarity. And, in fact, the interesting part is the only piece of evidence. That's where you want to focus your argument. The only piece of evidence they offered was the e-mail. The e-mail was dated September 20, 2012. Six of the eight counts occur before September 20, 2012. The only evidence they have about knowledge is that one e-mail. That's it. That's it. This was not harmless beyond a reasonable doubt. We know this for many reasons. First, we tried this case twice with a terrible jury instruction, the wrong jury instruction. I thought there was evidence that one of the defendants held a physical model, a molecular model. That's correct, Your Honor. All right? So that's not evidence of chemical structure? That is evidence that that defendant's aware, but we don't know the time frame when he held it. If I'm not mistaken, I think it was after the e-mail. That would be evident. On that note, he can testify about what he was showed, but he was unable to testify about what he was told about these two structures. So if you're going to admit some evidence of mens rea, don't you have to admit it all? I'll leave some of that to Mr. Schnook. We couldn't put in any mens rea evidence. We couldn't call Claude Cozy, the DEA agent. I thought you weren't going to talk about that. I'm sorry. You know what you told us? I'm glad to ask you questions about him. Yes, sir. But, no, I'm asking. I thought you weren't representing that. Your Honor, they bleed over, and the reason they bleed over— That's the problem with trying to divide up the argument that way. It sure the heck is. I'm new to this. Because I had a similar question because the appellants admit to selling spice products containing the substances at issue long before the conversations with Casey or McGee. It's— Correct. But that doesn't— How does— It doesn't prove they knew that they were structurally similar, Your Honor. We're asking, what's their mens rea? They have to prove. It's the government's burden to prove that. You know why you've taken so long to talk about that? You were going to talk about the— Is it Dr. Berrier or is it Berrier? What's his name? Berrier. But you haven't said a word about that. Yes, sir. I understand. I see my time is up. Because— Dr. Berrier was a chemist. No, no. I was talking to you. You let me finish. You don't have to go sit down yet. Maybe you'll talk a little bit more. Yes, sir. But do I take that to mean you don't think that's important? I think it's critically important. But you didn't say a word about it. That's—I apologize, Your Honor. I would have to rely on my brief. Why don't you take a minute now and tell us about Dr. Berrier? I'm for it, too. Right at it. You know, we're not a jury, so skip all that stuff. Just get right to the facts. Dr. Berrier was a DEA chemist.  We know who he was. Okay. He gave an opinion. It's an argument. He gave an opinion that was—the only issue for the trial court should have been— But that's covered by privilege, isn't it? No, sir. The only issue for the college court was was it material. It was material. At that point, under this Court's ruling in Rivera, once the court decides that evidence is material, then he's supposed to—the trial judge is supposed to turn to the government and say, you can either dismiss the case or allow the witness to be called. It's up to you. That's the only issue. It's not covered by the privilege. The privilege would apply to the document itself. Once the document's out, the cat is out of the bag. The opinion was out there. It's been out there for now six years. Well, that wouldn't mean it wasn't privileged. It might be the privilege has been waived. And that's what we argued. The privilege has been waived. That's why I said— Well, you said there's no privilege. That's not saying the privilege has been waived of two different arguments. You're right. I misspoke then, Your Honor. But I would say— Can I say this? You seem to me to be so anxious to drive some poor home emphatically that you continue to miss what our request of you is. Remember how I told you twice? We read your brief. We read your brief. You've taken your time to repeat stuff we know. Yes, sir. And, Judge Ager, you said just leave the Jewish stuff aside and go straight to the point. Your argument on Barrier, just take—if they'll allow, take 30 seconds and just tell us directly what's the argument. It wasn't privileged, or if it was privileged, it was waived. The district court didn't handle that question correctly. What is your argument on that on Dr. Barrier? The privilege was waived. Okay. It was absolutely material and relevant, and it was beyond—and it was so critical to the case. Tell us—you're getting to the point. We'll assume we can consider this testimony, but you still have to cross the burden of was it material. Tell us very succinctly why it's material. Dr. Barrier opined in 2012 that the substance we were selling and distributing was not structurally similar and its chemicals not substantially similar in its chemical structure to JWH-018. He gave the exact opposite opinion that the— But you had testimony of that in the record. And we knew this was coming, and the answer to that is yeah, but— Just answer it. Just answer it. Yes, sir. You had testimony in the record from chemists or experts saying it's not the same. Now tell me why it's not cumulative and why it's material in light of that. Because— Because any trial lawyer in the world will tell you that they would much rather have called Dr. Barrier who could not have been attacked for being a liar for hire. Any trial lawyer in the world. Mr. Hurt got up there in his closing— Unless you follow that editorializing, is your point he is a different status witness. Absolutely. And the others were attacked for being hired guns. Absolutely. And this is a government person, their kind of person, their person. That's right. Is that the argument? That's exactly the argument. Thank you. We got there. Yes, sir. Mr. Snook. Thank you. May it please the Court, Lloyd Snook, on behalf of Mr. Ritchie, the couple of points that I wanted to address, and again, I know that you have read our briefs, so I won't start with those. Get into it, then. Go on with it. The government in a lot of the issues that I was left to talk about, Mr. Cozy, Mr. McGee, and the hearsay issues, they want to paint all of these issues as we have to prove as an affirmative defense what we would argue is simply a negation of specific intent. And this is consistent with—we filed a motion, they filed a motion back before the first trial. We went through the first trial. We filed a motion to reconsider, in part, frankly, to reframe the issue. Isn't that an effect of a distinction between a testimony for an affirmative defense and testimony to negate mens rea? What is the real-world difference? There are two real-world differences. Tell me what they are. The first real-world difference is what does the jury instruction look like? Well, that's different now as to how—so I can see a distinction on how it's argued to the jury at some point. Right. What's the difference as far as how the evidence is offered and what it effectively does? And the second distinction is that the government's formulation of this requires and basically sets it up so that the judge gets to screen everything ahead of time. It requires that we meet certain elements— The judge may get—the judge does get to screen evidence ahead of time. Of course the judge does, always does. But it is—if the issue is solely am I trying to negate specific intent— You're not answering my question. What difference does it make, it looked like, at presentation of evidence at trial on those two points? And it's—I'm not arguing with you. I'm asking you a question because I'm trying to figure it out. Wouldn't the evidence be the same, I talked to somebody and somebody told me? Effectively, yes, if we get to that point. So the evidence offered for affirmative defense or to negate mens rea, it would sound like the same exact words offered the same exact way, and then the difference would be how the court instructed and what burdens he put on people and how you argue that to the jury? And also the difference of what screening the court gets to do ahead of time to say we've got these tests up here, and this is the question that the government has framed that I can't find in any opinion of this or any other court, but they have said we can only try to negate specific intent if we can prove it fits under some affirmative defense. And that's simply not the law. Well, that wouldn't mean then the court couldn't screen, you just say the court improperly screened. Because the court can screen—listen, anybody can— See, you're overstating your case. I was a district court judge. A person can move in limine on anything. Right. You can screen, and you hear what you have to say. That doesn't carry any water with me. But so you could—let me ask you this. Could it be that there could not be an affirmative defense, a person would legally not be able to argue affirmative defense, but yet they would still be able to offer evidence on mens rea? I guess I would answer that in two ways. The first way would be to say that you ought to be able to argue a negation of mens rea based on anything that helps negate mens rea. What if it was the same type testimony, though, talking to somebody? Well— Could you have— For some crimes, yes. For a specific intent crime— In this crime, in this crime. This crime, yes. So in other words, if you were properly negated, properly prevented from offering evidence as an affirmative defense evidence, would that necessarily mean you couldn't offer it for mens rea? Yes or no? You could argue now it was improperly excluded on affirmative defense, but I was just trying to— Well, Judge Jackson wouldn't let it in under either theory. You're not answering my question, though. Maybe I'm not understanding it. I'm going beyond it. I haven't asked you yet. I'm just trying to think of the circumstance in which you could not have the affirmative defense, just as a matter of law you couldn't have it, but yet you would still be allowed to have evidence on mens rea in this case. Does that circumstance exist? I don't—I mean, the government's argument— I'm not asking about the government's argument. I'm asking about your understanding of the law. And if you don't know right off, just move on to something else. I was just puzzled about that. Well, and, Judge, I guess my response would be that Judge Jackson thought that the answer— I don't care. I asked you what you thought. I disagree with Judge Jackson, but my contention is that under these facts, at least, that even if we couldn't fit it into the way of the specific— Why is the evidence of the former U.S. attorney, assistant U.S. attorney, why is that relevant at all? Well, it's relevant for two reasons. First of all, because when on August— He knows nothing about the chemistry of that drug. What does it go to, I think, is the question. What it goes to— Other than reliance on advice of counsel, which is an affirmative. Go ahead. It can be an affirmative defense, and the issue that I guess the courts— How is it, I think— Relevant. Same thing. How is it relevant to anything other than— How is it relevant to anything other than— And how is he qualified to offer anything that's relevant other than advice of counsel? Is that— Yes. And the answer would be that when on August 6th David Magee says, I'll take your case, I've checked with people, here's what I've found out, and why I think you're okay— Are you just repeating what other people said? That doesn't qualify you to be an expert. I'm not offering him as an expert. But you're offering him as an advice of counsel? What I'm offering him as is that Mr. Ritchie and Mr. Galecki go to Mr. Magee, who does have some knowledge, and they ask him basically, can we do this? And they're told yes. Advice of counsel. If you want to call it advice of counsel and— That's what we're trying to decide. He doesn't know anything about the chemical structure of the analog. He has done some things— Or he doesn't test—he wasn't being asked to testify as to that. I wasn't going to offer him to testify about the chemical structure. Clearly he would not be competent to testify about that. But he, as in terms of him being able to have given— Stop, stop. Then what would his relevance to the trial be? He would—I talked to a lawyer, and my lawyer said it's not a problem? That Ritchie and Galecki talked to lawyers, chemists, DA agents. To him, to this witness. This particular witness. Would be what? We told him what we were doing. He checked into things. He told us that the chemistry was such that he thought we were okay, given what the chemists he had talked to. And was he any different than I talked to a friend I knew who asked a couple lawyers, and he told me I'm good. What is it? Well, the issue is credibility. I don't think any judge would allow that. I don't see how that's relevant at all. Judge? Other than advice of counsel or some form of that. Virtually every case under the Controlled Substantial Law Act that has gone to trial has had some element of that coming into evidence. And virtually—including my McFadden case. You know what, though? We're asking you to justify it in this case, and we haven't heard it. You want to move on to another witness that might be a stronger witness that shouldn't have been excluded? Well, Claude Cozy would be the one that I most want to—you all asked me about Mr. McGee, so I was trying to answer that. That's why I also said to you, you started reading me, saying what happens in cases, and I suggested you move on to maybe a witness that you might have a stronger argument on. Well, Mr. Cozy, I think we have a stronger argument on. Why so? Because just to quote then Judge Gorsuch in the McCarr case, there is no stronger evidence of basically an innocent state of mind than you go to law enforcement, you show them what you've got, you ask them, are we okay? And that all occurred before he was ever raided? It happened after he was raided, but before the effective date of the conspiracy. So in this jurisdiction. So in other words, you're saying this testimony preceded the first date of the conspiracy? Yes, under this indictment. So what's the effect of Mr. Ritchie's testimony that he started selling these substances in March of 2012, which predates by some time all the other events? It may mean that he has no good defense to the indictment in Nevada, which alleges behavior in May, but it is still a good defense to this indictment in this court, which begins in August. But that's the defense. I mean, it circles back around to your characterization of it as a defense, rather than your characterization of it as relevant to his state of mind.  And yet when it helps on the innocent state of mind, you run into the fact that the conversations with both Casey and McGee post-date the sale. So it doesn't help you on the state of mind. So then you shift back to it's a relevant defense, it's advice of counsel. It's an affirmative defense. It's an affirmative defense. So that's an affirmative defense. You have to pick your argument and not sort of meld them as you would wish. Once Judge Jackson showed that he was completely distorting the factual record, I chose to go the other way. No, but you did it in response to the question. The question is, and you cited then Judge Gorsuch for the proposition that there is no stronger evidence of state of mind. But that doesn't fit your scenario because the state of mind has already been established by the fact that these sales were going on prior to the questions. So then it shifts back to, well, after I had been selling the substances, I checked, and it seemed okay then. If Mr. Ritchie had been permitted, he would have testified that before he sold XLR11, even the first time, he talked to a chemist, a Ph.D. chemist, Adam Libby, who told him these substances are not substantially similar. Give us the cite to the record that shows your best evidence that he had this knowledge before March of 2012. And it's relevant to Casey and McGee, which I thought is what you were supporting. Well, you're asking two different questions. Let's start with this one because it's obviously very important in terms of the mens rea, which is the bulk of all of your issues. What did your clients know they were doing at a certain time? Well, Mr. Ritchie's testified about when the sales began. So what I'm asking you for is what's your best evidence in the record that shows that he had knowledge before that time from one of these folks that you wanted to have as witnesses that what he was doing did not violate the statute? Best evidence. Record cite. I can't give you the specific page, but we had submitted a fairly detailed proffer of Mr. Ritchie's. Could you get it? Can you look? You're coming back on rebuttal. I would not be able to find it in the next 20 minutes. I didn't bring the whole record down. Could it go to weight? Could it go to chargeable weight? Absolutely. And that's one of the points that we tried to make to Judge Jackson was that even if you say nothing else happened except, say, on September 13th. Don't overstate it. What it being that you think, I think you should understand from the questions you're being asked, we have serious questions about it. Jury arguments don't help here. Just go straight. You may have sort of indicated because you don't know the record well enough to really say where it is or what it is. That's a bit of a problem, I think. But we have serious questions about this. And so your argument, your answer to me would be something like, I'm just asking because maybe it's the quickest way to get there, that at least we would have an argument that from the time these witnesses told him it wasn't a problem, that he would have a defense to sell from that point on that he couldn't be, I mean, he would still be guilty of selling before that point. And, Judge, I. But that it might affect the weight or some sentencing impact. Judge, I thought that that was where I was getting to, and I apologize if I wasn't clear, that if on July 26th. Is that the answer, then it would go to weight? It would go to innocence on this indictment because if it would go to weight at all for something to happen mid-indictment, it would go to innocence as to something that happened before the indictment. No, it wouldn't. Why would that? Because if I. No, if he had mens rea, that, I mean, somebody could, he could be, he could say, the jury could find, in effect, that a person inferences or that person knew it was illegal the way he sold it and all that. But then halfway through the conspiracy period, he got this testimony and they could say that then negates mens rea. That wouldn't make him innocent all the way back necessarily. No, sir. I'm not. My point was that when the the conversation with Claude Cosi happens on July 26th and he is told at that point, or given reason to believe, let me put it this way, that what he's doing is not illegal and he has provided the record, everything else, that if he had been given any contrary advice on July 26th, he wouldn't have gone in on August 8th and started the first sale that is recorded as a part of this indictment. So the notice through Cosi and the discussion with Cosi happened in the first instance completely before the period of the indictment. Thank you, sir. Thank you. Thank you. You have a few minutes reserved for rebuttal. Thank you. Mr. Hurt. Thank you, Your Honor. Good morning and may it please the Court. I'm Eric Hurt, assistant United States attorney from the Newport News Division, and I was, along with Mr. Hudson, who's sitting at the council table, the trial counsel in this case. This case is much like McFadden factually in the sense that these defendants are charged with the analog statute. However, they knew much more than Stephen McFadden ever knew. These defendants were engaged in the business of selling this product. They knew its structure. They knew its effect. They knew the name of the substance, not just its street name, but also its full chemical name. They had lab reports which laid this substance out, which explained the name of the substance. Give us your best evidence on how they knew the structure and when they knew it. Yes, Your Honor. So two things. One, there's the direct evidence, and then there's the inferential evidence that might be found in the analysis conducted in McFadden 2. Just tell us what it is. The direct evidence would be, one, in September of 2012, they were privy to an email which was sent to them. It's contained in our brief. It's evidence number 76, I believe, which outlined not only the substance, the substance to which it was an analog of, in this case UR-144, an analog of JWH-018. It talked about the pharmacological effects of the two and how UR-144 was similar in its pharmacological effects. And it also laid out how UR-144 and JWH-018 were substantially similar. And this monograph, which was attached, and you can see it on the third page of the exhibit that there is an attachment, described why DEA considered it to be an analog. And so that covers two points, actually, Your Honors. First, it covers that the defendants were clearly on notice that this substance was treated as a controlled substance or an analog under the statute. And, of course, we know that's prong one in proof of mens rea. And then the second part is, did they know the pharmacological effects and the structure? And that email lays out exactly all of the issues under McFadden. But are they entitled to have testimony to the contrary presented? What the DEA says, quite frankly, isn't chapter and verse of the law. Why wouldn't they be entitled to have evidence of contrary information they had? And then the jury can decide. Well, Your Honor, I think there are two parts to that. One, they were entitled to present evidence. And, in fact, Mr. Ritchie, when he testified, went through a whole litany of why he did not believe. He, in fact, testified that they ---- I'm talking about other witnesses, some of these witnesses who were excluded. Why wouldn't they be? Why shouldn't they be allowed to have them testify? Well, Your Honor ---- Dr. Barrier. That seems to be the one who's, you know, he's, as opposing counsel said, he's not a paid gun, and from a credibility standpoint, he would have been qualitatively different from all the other witnesses that did appear. Dr. Barrier, we believe the analysis conducted by the district court was accurate. This is an issue where Dr. Barrier offered his opinion, not in a clinical sense, but in a decision-making process within DEA. So that is, in effect, privilege to the United States government. If the court determined that in some way the privilege had been waived, and we do not concede that because ---- Hasn't it been disclosed in other cases? Your Honor, and again, that goes to the tension which we raised in our brief on the Brady issue. It either has or it hasn't. It has. It has. Is it available online? I will accept the defense's representation as it is. I do not know ---- That's hard to say. It hadn't been waived then, hadn't it? So it's waived to everybody in the world, but this defendant? I mean, the government's making a point. We've given it to other people, and it's online, but it's privileged? You want to make what's ---- I'm not going to spend time on that, Your Honor. I will concede. Okay. So let's go to materiality. Yes, Your Honor. So ---- You're saying that what could be more material than this particular witness's expert testimony? And the materiality, I would suggest, can be looked at from two perspectives. One, he's material because he's from DEA. That's the only reason he's material. That's a pretty big reason. But what ---- Except for the fact that the United States in the trial in which Mr. Barrier was called by the defense, or attempted to be called, the United States in its case in chief did not put on a DEA chemist in our case in chief. And so it was not a question of, oh, he's DEA. Our witness was subject to the same cross-examination as the defense. And, in fact, Dr. Dudley was able to testify to the same analysis that Dr. Barrier. If you look ---- Well, the ---- He started out by saying he's DEA, which is not insignificant. Will you agree with me on that? That in terms of credibility, his position burnished his ---- would burnish his credentials in the eyes of the jury. So the fact that he is DEA would seem, at least arguably, to take him out of the run-of-the-mill category of witnesses. So the fact that there were other witnesses doesn't address that distinction. Yes, Your Honor. I would agree with you that the fact that he is a DEA chemist is an issue that the defense would want to make much of. Absolutely. What you would want, if you had somebody in their organization, whatever you call it, who said, I'll tell you, I looked at it, no question, it's 100% the same thing. I bet you'd want to present him. And you would think that's a lot better than just having some other uninformed, I mean specifically informed, witness come in. You'd put him on the stand, wouldn't you? I would want to, Your Honor. The question is, could I? Oh, I bet you would argue you could, and you would argue it was material. I would argue, and I think I don't disagree with you, Your Honor. I wouldn't doubt you. So we were all in agreement that it was material? I think the question is, is the fact that he's with DEA, is that material? The answer is yes. Well, my question is, well, what I was asking you to do was address materiality. And as I understood it, you said it had two components. One is his status, and two is his knowledge. Is that a fair synopsis? That's correct, Your Honor. Okay. You don't get to parse those two, do you? It is one witness. So what he would, whether or not his testimony would be material would be and his expertise. Are we kind of on the same? I mean, I'm trying to get an answer. We've decided, we've gotten very close to deciding that privilege was waived. And then the next question is, is it material? The only thing about, I think the only argument for barrier being material is his status. In the context of this case. The reason that that wouldn't be sufficient is what? Even if that were true, what difference does it make? I'm sorry, Your Honor. I'm a little confused. Well, if his status makes him material, so the fact that the defense can call him and say, you're DEA, so you're material. No, the question is his status for purposes of the testimony he was presenting. He doesn't just stand up and say, hey, I'm a DEA agent, and I'm just here to burnish the testimony of the government or the defendant. I'm not understanding why that isn't enough. Also, if we don't agree on that, we still need to go forward, because that isn't helping me. So if that alone is not helping me, we need to go beyond that. Well, it's status and knowledge, isn't it? It's his status, but also his knowledge. It's both. They don't want to call him just to say he's a DEA agent. They want him to say, I work for DEA, and this is not an analog. How is that not material? No, you're correct, Your Honor, and I'm sorry I misunderstood that context. That's my question. But how is that not material? How is that not material? A DEA person, scientist, chemist, I don't know exactly what the word is, goes, this is an analog. Why isn't that material? Because the issue is for the court, the jury, to make the determination, right? We have people testify all the time. But DEA is not the arbiter of what is or is not. Does he have an opinion? Neither is any expert witness. Yes, Your Honor. No expert witness do you say, whatever this expert says, jury, that's it, case over. It's just a person who has credentials, who testify, and why isn't that material, his knowledge and his capacity? It seems to me you're foundering just a little bit because it's hard to come up with an explanation. And I guess as we analyze it. You aren't surprised by these questions on materiality, are you? Unfortunately not, no, sir. Okay. And so as we look at Dr. Barrier, the question would be, is he still material if you don't allow him to say I'm from DEA? And, okay, I understand your argument about cumulativeness. The question that I'm asking is, doesn't the fact of his status make it more than cumulative? And if not, what is your authority or rationale for saying that it doesn't? What's your authority for saying that the fact that this DEA agent may add to the testimony of their hired, of the people they hired to say whatever they said? What authority is there for deciding that that isn't sufficient to distinguish? And, Your Honor, I'm not trying to parse this, but on the cumulative issue, that question would apply to any defense expert the defense wanted to call in addition to the ones I presented. It wouldn't because, as you have recognized, it is an adder. It's an additive. The fact of his status, and I'll stop now because I think we're just going around in circles, but I am trying to understand why that additive factor, and I think most of our questions have gone to that, why that isn't enough to lift it out of the status of the merely cumulative? Well, I guess I would disagree. I think it does lift it out of merely cumulative. The question for the Court, though, under 403 is, is that materiality which we've kind of talked about enough to allow him to testify? And the United States does not believe it is. This witness, aside from his DEA component, says what Dr. Dudley would say. And the Court found that, one, this was part of the deliberative process. I'm sorry, Your Honor? Remind us, who were the DEA's or the government's witnesses to show chemical similarity? We had one witness, Dr. Coop, Andrew Coop, who was from the University of Maryland. He was our sole witness on the issue of substantial similarity structurally. We did call a rebuttal witness after Dr. Dudley and Dr. Crook testified to talk about some very specific issues and to introduce one exhibit. But we did not have a DEA agent, I'm sorry, a DEA chemist in our case in chief on that issue. How do you separate the question of the affirmative defense on advice of counsel and evidence on mens rea? Is there any difference in your mind? Well, and I would go back to the Court's analysis, which is the mens rea offer that the defense made really consumes the affirmative defense. So when you say affirmative defense, you have a certain criteria that you must meet. I'm not sure that's correct, but I'm asking you. I'm just trying to understand, and I ask the other side, wouldn't the evidence for affirmative defense, basically, wouldn't it be the same evidence for mens rea and it would just—the only difference I can come up with would be how it's handled in the charge and argument to the jury. Is there any other difference? So it's not subsumed. I don't think that answers the question, to my mind. Well, Your Honor, I think that, you know, the Eleventh Circuit is the one circuit that's kind of allowed this general mens rea attack. Right. I think the other circuits recognize that when you place this structure of either advice of counsel or advice of authority— But there is a distinctive difference, though, between an affirmative defense and the government having to prove the elements of the crime. In this case, it's specific knowledge. That's got to be the difference that matters somewhere, because one of the burdens on the defendant, the other is the burdens on the government. So there has to be a difference between it, doesn't there? I'm not sure there is — I'm not sure there is a legal difference in the sense that— Well, there's a legal difference in how it — I'm taking you back now. It seems to me it's how the jury instructions are given, if you note this distinction, and how you can argue it to the jury. But why wouldn't it be in this kind of case, if there was testimony, if somebody said, I told Mr. Smith that is not an analog, and he could be wrong about that, but if that's what Mr. Smith was told and the jury finds it was reasonable for Mr. Smith to believe that, or that he informed his knowledge based on that, why wouldn't that negate mens rea? Well, I think that is a reasonableness. And I would offer to the Court— I know, but why wouldn't that negate mens rea, the example I just gave you? The guy goes, what the heck? I thought I was selling chewing gum. I didn't know that was drug-laced gum. And I was told by the people I bought it from that it wasn't. Why doesn't that negate mens rea? Well, I think, at the peril of answering your question, I think it could. But in this case, that was not the evidence that was to be offered. A lot of it was excluded, though. And the judge performed the gatekeeping function after having seen what the evidence was and finding that it did not go to an issue properly before the jury. Why didn't Cozy's testimony go to that? Well, for a number of reasons. One, Cozy does not appear in the case until July of 2012 after they've been selling this product for four months. So Cozy's statements, whatever they were— Could that go to wait or the time of the conspiracy? I'm asking you that. I don't believe that would be the case, either. Why? Because Cozy makes very equivocal statements. Oh, no. You're just assessing the value and the weight of his testimony. Why couldn't they argue, he said this, he means this? You would go, that's not really what he said. That didn't go to the question of whether or not his testimony is relevant. No, Your Honor. I think we can all agree what he would probably say, which was, I came there. I didn't really know what they were dealing with. They told me, I don't know if people are smoking this. And I left and conducted an investigation. And? How does that — the Court found that is not proper evidence to inform the defendant's mens rea. But Mr. Cozy — I'm sorry, Mr. Ritchie testified about that regardless of the Court's ruling. Mr. Ritchie testified, DEA agent came to my place. I talked to him. I gave him a sentence. So why is the DEA agent excluded from saying that is correct? I did tell him that. Why is that excluded? Well, the Court found that we were moving into the direction of confusion, that the defense could not meet the standard for admission of that evidence. In what theory? Because it was affirmative defense? Yes. Well, did he draw a distinction, like I'm asking you to draw? Do you think if it's not an affirmative defense, then evidence of mens rea is not allowed? You can't — the government's position can't possibly be that. No, I agree. And, Mr. — So you can't — so then the — I'm just saying now. I'm not trying to trap you. No, I agree. The government has to concede — I think it would have to concede in this specific knowledge-type crime that a defendant has to be able to offer evidence that he, on the information he knew, he didn't have mens rea. Well, Your Honor, I think that — that goes also to the mens rea. What is the actual mens rea in this case? Specific knowledge of the requirements that the Supreme Court has said. Right, which is that they knew the structure and the pharmacological effects. The defense have grafted onto that that they knew it was substantially similar to a Schedule I substance. That's not what the law says, because the law says you can have the mens rea without knowing anything about the Analog Act at all. You don't even have to know it exists. If it's a controlled substance. If you have knowledge of the substance and its structure and its pharmacological effects, that is sufficient. It cannot be. Just because you know it, it has to be that it's substantially similar. That's the definition of analog, but I would invite the Court's attention to the ruling. I find it very confusing. The second way to establish knowledge is that the defendant knew the specific analog he was dealing with, even if he did not know its legal status as an analog. I'm just saying how you formulated that could not be correct. You just said if you know it and you know the chemical structure, that makes no crime. It can't possibly, because let me explain to you why. People sell chewing gum and they know the chemical structure. That doesn't make it a crime. It can't possibly be true. Your Honor, I mean. It means that they know the chemical structure. You have to have something else that it's similar to or is a controlled substance or substantially similar to an analog. It just can't be that you know. I mean, that's not the law. Well, in the chewing gum example, it wouldn't be an analog. But the question here is. He didn't say that, though. That's not what he said. Oh, I'm sorry. That's what I was reading. No, I'm talking about what he said, not what you said. Because I was reading what the Supreme Court said, which I find confusing, too. It is confusing. Your Honor, may I quote? I see I'm out of time. But it would have to be that's a statement made in the context of what the facts are in that case. That statement by itself is not sufficient. Let me ask, why doesn't Dudley? Why was Dudley excluded? Was he excluded under some rule? Professor Dudley testified in both trials, Your Honor. But he wanted to testify. I thought Dudley wasn't allowed to testify that this was an analog of another drug. He wanted to testify about two different, a different comparison. I know. He wanted to say this is not an analog of this drug. This is an analog of something else, which isn't a problem, correct? And he was excluded from testifying, I thought. Dr. Dudley wanted to take two drugs and show how they were compared so that he could say his view of the comparison between UR-144 and JWH-018 was more proper. The two drugs that were excluded were not in this case at all. Oh, he was not saying that the drug in this case was an analog of a third drug and not the drug the government's charging. I thought that was his testimony. Correct, Your Honor. He wasn't going to say that.  He was just talking about how he came up with the concept of analogs. And how DEA was silly for the way they conducted business. Okay. Any more questions? I'm doing. You are out of time, but we were very generous with appellants. And you may have 30 seconds or so to conclude, and then we will return to Mr. Smith for rebuttal. Yes, Your Honor. And as the judge said, I would just like to clear my name so I'm not completely crazy, I hope. This Court has said that under the… And I suggest you don't worry about it. I don't think you're crazy. So don't waste your time. Don't waste your time on that. Make a point you want to make. Well, what does the Court say? The government may establish that the defendant knew the specific analog he was dealing with, even if he did not know its legal status as an analog. Yes. And from the Supreme Court, the defendant need not know of the analog statute. And so I… Yes. I understand. That's what it says. That's what it says. Now, listen to me. You want to get into it, we're going to get into it. We can play it back. That's not what you said. You did not reference analog. You said he knows the chemical structure. That's all you said. And I'm just saying it has to be chemical structure in the context of more, an analog or something else. It just cannot, it simply cannot be. We can talk about that when we shake hands later, if you want. You meant to read, you meant to simply quote the language of McFadden. This is the second method of proof, which is much simpler. Knowledge, on knowledge, yes. Yes, Your Honor. Thank you. I think, I do think we understand that. We may not understand much else, but I think we've got that. I'll need help later. Thank you. Thank you. Thank you. Thank you. If I may make just a couple of quick points. Judge Agee, we did a little bit of checking. At least one reference that would have additional information about when they first started selling the drugs and what information they had before they started selling them. And that was in the joint appendix at page 2142. And in which they said, in which he said that they had been conferring with a chemist, Adam Libby, during the summer of 2012. So we know that there were additional contacts. Postdates Mr. Ritchie's testimony. Beg your pardon? Postdates Mr. Ritchie's testimony is when he. It's a little, it's vaguer than Mr. Ritchie's testimony. Okay. We agree that there was something, that there are some aspects to what Mr. Ritchie said that, frankly, I wasn't focused on. Not only he was focused on, because. You've levered up your light. Is that deliberate? No. Simply because our thinking August 8th was the relevant date for determining conspiracy. That's the date in the indictment. And so that's what we were focused on. So the couple points that I wanted to make. First of all, there was a question to Mr. Connell at one point about Mr. Ritchie having said that he had at one point held the model that had been constructed for him. I don't think it's in the record here to show what those models looked like. It was in the PowerPoint that the experts had. But if you look at those, I think it would be apparent that there were But I think that also happened. Mr. Connell? Beg your pardon? You're here on rebuttal. You're rebutting Mr. Connell? No, I'm not. Okay. I'm providing a slightly different answer to I believe it was Judge Shedd's question. Judge Agee. Judge Agee. Okay. Whoever. I'm sorry. So the second point that I wanted to make is that Exhibit 76, which was referenced by the government, that's being the September email, the monograph that was supposedly attached was never put in evidence. The jury never saw it. More importantly, we were never allowed to provide any context for it, any response to it, what we did with that knowledge, what contacts we made, how we contacted a chemist to ask what's the story here. If barrier was material, what does that mean? What does that mean in this case? We believe that if barrier. I'm just asking, if it's material, what does that mean? Make your argument on that to us. We believe that if barrier is material, then we get a, we ought to be allowed to present him, to call him as a witness. What are you asking for procedurally? We need. A remand or another trial. Or a new trial. Yes. Okay. And all of the issues that we've raised here, we believe, go to that eventual result. I also want to note that when the government says, well, we didn't call a DEA chemist, well, of course they did in rebuttal, and he actually was allowed to express an opinion on substantial similarity. And his opinion on substantial similarity was an entirely different analytical framework. But they were allowed to get the DEA. What do you think your single strongest argument is for a new trial? As you stand there right now, what is your single strongest argument for a new trial? The jury instruction. Okay. Now, we think, obviously, the jury instruction is, that whole thing is confusing. But we think we could, that's the easiest way to get where we want to get to. We think the evidentiary issues. I didn't ask you for the easiest way. I said the strongest point. The strongest. Which is not to discount what we believe to be the strength of the other issues dealing with the witnesses, including the hearsay question. Right. The only other point, and I say I'm about to be out of time, is that overall. You're out of time. Oh, I'm sorry. I saw it now counting up. Okay. It's simply that I think that the Court made reference to this, that when a group of anonymous DEA chemists makes a point within internal processes, that doesn't have the force of law for the rest of the world. Thank you. Thank you very much. I will, thank you. I would ask the clerk to adjourn court, sign and die, and we will come down and greet counsel. This honorable court stands adjourned, sign and die. God save the United States and this honorable court.
judges: Allyson K. Duncan, G. Steven Agee, Dennis W. Shedd